50807. SWIFT TEXTILES, INC. v. LAWSON.

STOLZ, Judge.

Swift Textiles, Inc. (Swift) sued W. C. Lawson (Lawson) in the Superior Court of Bleckley County for an alleged breach of contract arising from the following factual situation. Swift is a textile manufacturing corporation. Lawson is a cotton merchant/buyer/broker. There has been a custom in the cotton industry whereby cotton farmers contract to sell their crops to cotton merchants at or shortly before the time the cotton is actually planted — months before it is picked and baled. The cotton merchants would then enter into contracts

with the various textile mills, such as Swift, for supplying the mills' cotton needs in a stated specific amount at an agreed price (usually slightly more than that which the cotton merchant had paid to the farmer for the cotton).

In March 1973, Swift and Lawson entered into a written contract whereby Swift agreed to purchase from Lawson and Lawson agreed to sell to Swift 5,000 bales of cotton of specified quality for 31 cents per pound, for delivery at the rate of 1,250 bales per month in each of the months of September, October, November and December, 1973. The contract provided "for forward delivery" as defined in the Southern Mill Rules, the governing provision being: "Contracts for forward delivery shall be based on a weight of 500 pounds per bale at destination . . . and if necessary to bring the actual weight of cotton delivered within the total weight of contract thus calculated, the seller shall deliver more or less bales than the number stated in the contract as the case may require . . . Dissatisfaction with weights delivered to buyer must be reported by buyer to seller or his agent within fifteen business days from receipt of shipment."

Beginning October 8, 1973, Lawson began delivery of cotton under the contract. Delivery continued until around March 12, 1974, by which date 5,001 bales of cotton had been delivered by Lawson to Swift. However, due to the fact that most of the bales weighed under 500 pounds, the net weight of cotton delivered was only 2,016,733 pounds, or 483,267 pounds short of that contemplated by the contract, i.e., 5,000 bales of 500 pounds each = 2,500,000 pounds of cotton, less 2,016,733 delivered. On October 10, 1973, Swift wrote Lawson advising of a shortage in the bale weight of the four loads of cotton delivered at that time (averaging 384 lbs.) and informing Lawson that Swift expected delivery of a total of 2,500,000 pounds of cotton. (R. 26.) Throughout the contract period, Swift's cotton buyer orally communicated to Lawson, Swift's dissatisfaction with the bale weight of the cotton delivered and that Swift expected the cotton equivalent of 5,000 bales of 500 pounds each.

Swift brought this action to recover the difference between the contract price of the cotton (31 cents per pound) and the market value of the specified type cotton

(80 cents per pound) on December 31, 1973 (last day of the contract period) plus "landing costs" of 1 1/2 cents per pound, totaling $244,049.83.

Swift moved for summary judgment. In his affidavit in opposition to the motion for summary judgment, Lawson stated that he first obtained verbal agreement from a large number of farmers to sell him their cotton crops at 30 cents per pound, pursuant to which he contracted to resell the cotton to Swift at 31 cents per pound. When Lawson attempted to have the farmers commit their verbal agreement to writing, many refused and demanded 31 cents to 32 cents per pound for their cotton. Written contracts were entered into between Lawson and various farmers, which resulted in Lawson's purchasing cotton from farmers at the same or a greater price than that at which he was selling to Swift. Around September 1, 1973, it became evident to Lawson that many of the farmers he had contracted with, intended to repudiate their contracts due to a dramatic increase in cotton prices. On September 24, 1973, Lawson wrote Swift informing Swift of the above situation and advising that he "may not be able to deliver to you the 1973 cotton you are expecting me to deliver." Swift responded to this communication by stating that it expected performance of the contract and advising: "The September portion is almost past-due. We need this cotton." Lawson's affidavit went on to describe the extensive means to which many farmers resorted to avoid their contracts with him, the extensive litigation he was forced to resort to in order to compel performance of farmer contracts with him and the rapid increase in the price of the cotton he purchased to supply Swift: 50-80 cents per pound, with a market high of 90 cents per pound. Lawson showed that he had contracts to supply cotton to several mills in addition to Swift, and did allocate among the contracting mills the cotton he was able to obtain and made delivery of 84.06% of the cotton contracted for by Swift. Lawson contended that under the Swift contract he was entitled to a reduction of 93,493 pounds as "tare";[1] that Swift did not give him the

---

[1] The weight of "bagging" and "ties" (steel bands or wire) in which the baled cotton is contained.

requisite 15 business days after each delivery of cotton notice of dissatisfaction with the weight of cotton delivered; that Lawson delivered, and Swift accepted, 554 bales of cotton in January, 1974, 328 bales in February, 1974, and 302 bales in March, 1974; thus there was no breach of contract in December 1973. Lawson stated that the price of cotton in March, 1974, was lower than in December, 1973, and that the March 1974 price, not the December 1973 price, should prevail.

The trial court found the determinative issue on Swift's motion for summary judgment to be the defense of impracticability, founded on Code Ann. § 109A-2—615, and denied the motion, but certified the matter for immediate review pursuant to Code Ann. § 6-701 (a, 2). *Held:*

Code Ann. § 109A-2—615 (Ga. L. 1962, pp. 156, 220) provides: "Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:

"(a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

"(b) Where the clauses mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.

"(c) The seller must notify the buyer seasonably that there will be delay or nondelivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer."

In answers to Swift's requests for admission, Lawson admitted that the following provisions of the Southern Mill Rules were a part of the contract with Swift: "17.

When a sale is made for shipments in a given month, cotton must be shipped and bills of lading, or mutually acceptable equivalent therefor issued within the month specified.

"18. The seller is not to be held responsible for delays caused by act of God, fire, war, riot, strikes, floods, embargo, car shortage or quarantine which affects the cotton contracted for by him for fulfilling his sale. In all cases where shipments are delayed beyond the time specified in contracts, for reasons set forth above, and the seller claims that the delay is due to these causes mentioned, the seller shall give notice to the buyer on the expiration of the shipment period, and within two business days after the end of the specified shipment period by registered mail, or otherwise deliver to the buyer an affidavit showing positive reasons for the delay. If such affidavit is not furnished within five business days the buyer may cancel that portion of the contract, or may buy in open market cotton for immediate delivery, the market difference to be adjusted between the buyer and seller, with one-quarter cent per pound penalty against the seller. *If for any reasons except those mentioned above, the seller fails to make shipment or delivery within the time specified in the contract, the buyer may cancel the contract for the portion within default, or may buy in open market cotton equal that contracted for, in either case the market difference to be adjusted between the buyer and seller, with one-quarter cent per pound penalty against the seller.* If the buyer buys in open market, the seller may, upon request, have a comparison made by the Classification Committee of the type or samples used in the original contract and for the cotton purchased as replacements.

"28. All sales shall be on the basis of buyer's weights on arrival of cotton at destination. In case such weights show an excess or loss as compared with invoice weights, settlement shall be made by each party for such excess or loss." (Emphasis supplied.)

Lawson also admitted that on or prior to December 31, 1973, cotton of the type and quality meeting the requirements of the contract in quantity exceeding 483, 267 pounds, was available for purchase on the open market, but contended that purchase was impractical

because the price had become prohibitive.

We have not found any Georgia authorities interpreting Code Ann. § 109A-2—615, supra. However, the following commentaries are helpful in resolving the issue. "Assuming that procedural requirements have been satisfied, the seller is relieved from liability for nonperformance because of an occurrence of a commercially unforeseen condition. Specifically, the seller is excused if performance as agreed has been made 'impracticable' by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made. It is to be noted that the Code does not require proof of impossibility of performance but merely that of impracticability, which term must be interpreted as commercial impracticability. To that extent the Code makes the contract less binding on the parties by widening the grounds for which a seller may be relieved of his obligation. A question of fact may arise as to whether the nonoccurrence of a given contingency was a basic assumption; the fact that the contingency was contemplated by the parties indicates either that the seller assumed liability therefor or that by definition it was not an excusing contingency within Code § 2-615 (a). No exact definition of the range of excusing contingencies is possible, the Code provision being intentionally drawn in general terms to permit its wide and flexible application." Anderson, Uniform Commercial Code, § 2-615:6, p. 302. "Under general principles of contract law which continue under the Code because not displaced, difficulty, inconvenience, or unusual cost in performing, even though it may make performance of the contract a hardship, does not excuse a party from performance of an absolute, unqualified undertaking to do a thing that is possible and lawful. Mere unexpected difficulty or unforeseen expense encountered by the seller does not excuse nonperformance on his part. Thus, the fact that one who, as a dealer, had contracted to sell a stated quantity of produce would have to pay more for it than was contemplated by him when the sales agreement was entered into does not absolve him from his undertaking." Anderson, supra, § 2-615:12, p. 305.

"1. This section excuses a seller from timely delivery

of goods contracted for, where his performance has become commercially impracticable because of unforeseen supervening circumstances not within the contemplation of the parties at the time of contracting . . .

"2. The present section deliberately refrains from any effort at an exhaustive expression of contingencies and is to be interpreted in all cases sought to be brought within its scope in terms of its underlying reason and purpose.

"3. The first test for excuse under this Article in terms of basic assumption is a familiar one. The additional test of commercial impracticability (as contrasted with 'impossibility,' 'frustration of performance' or 'frustration of the venture') has been adopted in order to call attention to the commercial character of the criterion chosen by this Article.

"4. Increased cost alone does not excuse performance unless the rise in cost is due to some unforeseen contingency which alters the essential nature of the performance. Neither is a rise or a collapse in the market in itself a justification, for that is exactly the type of business risk which business contracts made at fixed prices are intended to cover. But a severe shortage of raw materials or of supplies due to a contingency such as war, embargo, local crop failure, unforeseen shut down of major sources of supply or the like, which either causes a marked increase in cost or altogether prevents the seller from securing supplies necessary to his performance, is within the contemplation of this section." Official Comments, Uniform Commercial Code, Section 2-615.

"A number of cases have involved the inability of a seller of a commodity manufactured or produced by a third person to obtain the same from the latter as a defense to an action by the buyer for breach of the contract. Such cases have involved such sellers as middlemen engaged in marketing farm produce or wholesalers or others marketing products obtained from others. Whether such impossibility is a defense depends upon whether the seller's promise was absolute or conditional, although it would seem that the seller in such a case is generally under a duty, when it engages to sell a product which it is to obtain from another, to place itself in a condition by

adequate contractual relation to obtain the product in the quantity which the seller has contracted to be delivered to the buyer. While a contract for sale is not necessarily invalidated by the fact that the seller does not own the goods at the time of contracting, the fact that the seller is not able to obtain the goods or merchandise so as to make delivery when agreed does not ordinarily excuse the seller's failure to deliver the goods at the agreed future date. The same is generally true where the seller finds it more difficult or expensive to obtain the goods called for in the contract than was anticipated. Thus, the fact that one who, as a dealer and not a grower, has contracted to sell a stated quantity of vegetables or grain would have to pay more for such quantity than was contemplated when the engagement was entered into does not absolve him from his undertaking." 67 AmJur2d 515, Sales, § 365.

*"The Code Section [109A-2—615] expressly recognizes the right to impose, by the terms of the contract, a higher standard upon the seller, with the result that the parties may restrict the excusing contingencies to those specified in the contract or may eliminate the protection given by the Code section by imposing upon the seller an absolute contractual duty to make delivery."* Anderson, supra, § 2-615:3, p. 301. (Emphasis supplied.)

In the case before us, the seller contracted (paragraph 18, supra) "If for *any reasons* . . ., the seller fails to make shipment or delivery . . ., the buyer may . . . buy in the open market cotton equal that contracted for . . . the market difference to be adjusted between the buyer and seller, with one quarter cent per pound penalty against the seller." (Emphasis supplied.) Here the buyer, Swift, did no more than the seller, Lawson, agreed could be done pursuant to their contract upon a failure of delivery *for any reason.* "Where the seller fails to make delivery . . . then with respect to any goods involved, . . . the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid . . . recover damages for nondelivery as provided in this Article." Code Ann. § 109A-2-711 (1) (b). "Subject to the provisions of this Article with respect to proof of the market price (109A-2-723), the measure of damages for nondelivery or repudiation by the seller is the difference

between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this Article (109A-2-715), but less expenses saved in consequence of the seller's breach." Code Ann. § 109A-2—713 (1). Swift's suit amounts to no more than an attempt "to adjust the difference" between the contract price of the cotton and that purchased by Swift in the open market. Accordingly, we hold that the trial judge erroneously denied Swift's motion for summary judgment on the issue of Lawson's liability under the contract. The amount of damages and other issues of fact, are not ruled upon as the other grounds of the motion for summary judgment were not passed upon in the trial court.

*Judgment reversed. Deen, P. J., and Evans, J., concur.*

ARGUED JUNE 30, 1975 — DECIDED SEPTEMBER 2, 1975 — REHEARING DENIED SEPTEMBER 24, 1975 — ▮▮▮▮▮▮▮

*Hatcher, Stubbs, Land, Hollis & Rothschild, Howell Hollis,* for appellant.

*Lawson & Lawson, Roger H. Lawson, Adams, O'Neal, Hemingway, Kaplan, Stone & Brown, H. T. O'Neal, Manley F. Brown,* for appellee.