**ALIMENTA (U.S.A.), INC.,
Plaintiff-Appellant,
Cross-Appellee,**

v.

**GIBBS NATHANIEL (CANADA) LTD.,
Defendant-Appellee, Cross-Appellant.**

**No. 85–8910.**

United States Court of Appeals,
Eleventh Circuit.

Oct. 23, 1986.

W. Lyman Dillon, Atlanta, Ga., for plaintiff-appellant, cross-appellee.

E. Penn Nicholson, David C. Newman, Atlanta, Ga., for defendant-appellee, cross-appellant.

Before GODBOLD and HILL, Circuit Judges, and LYNNE *, Senior District Judge.

LYNNE, Senior District Judge:

Appellant contends that appellee was not entitled to rely on the defense of commercial impracticability, an issue presented for our review by motions for a directed verdict and for judgment NOV. By cross-appeal, appellee insists that the Court committed reversible error in instructing the jury to find it responsible for delay in delivery after March 18, 1981, to which it objected. We affirm.

### I. *The Direct Appeal*

A. In July, 1980, Alimenta (U.S.A.) Inc. (Alimenta) of Georgia and Gibbs, Nathaniel (Canada), LTD. (Gibbs) of Toronto, Canada, each an international dealer in agricultural commodities, entered into three separate contracts in advance of the 1980 peanut harvest. Gibbs was the seller and Alimenta the Buyer under each contract; neither was a grower. All three contracts called for the delivery in installments by Gibbs to Alimenta of *1980 crop U.S. runner split peanuts.*[1] When Gibbs failed to deliver all

---

* Honorable Seybourn H. Lynne, Senior U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. Each contract called for Gibbs to deliver equal installments of the total amount due, for each month from October through January in the case of the first two contracts, and for each month from October through December in the case of the third contract. The following chart summarizes the quantities due, the quantities as to which a cash settlement was agreed (indicated by brackets), the quantities actually shipped, the date of settlement or invoice for

of the quantities specified in the contract and made deliveries later than the scheduled dates, Alimenta instituted this action on August 21, 1981, seeking damages for breach of the three contracts.

Relying upon the provisions of O.C.G.A. Sec. 11–2–615,[2] Gibbs affirmatively answered that its delay in delivery and nondelivery in part were excused by the occurrence of a drought in the peanut growing areas of the southeast and southwest.[3] By motion for directed verdict at the close of the evidence, Alimenta submitted that as a matter of law Gibbs was not entitled to rely upon Sec. 11–2–615. Alimenta's argument runs something like this: because Gibbs did not insist upon a contractual provision relieving it of liability for delay or nonshipment owing to contingencies beyond its control, as a matter of law it "assumed a greater obligation" within the exception of the introductory sentence to Sec. 2–615. We do not agree.

Experience teaches that there are many risks inherent in agricultural production and marketing, not the least of which is a crop failure due to some natural disaster. Under Alimenta's theory, a farmer who contracts for the future delivery of his crop is, as a matter of law, foreclosed from reliance upon Sec. 2–615 because such risk was foreseeable and was assumed when not negated in his agreement. This would drain the vitality out of the allocation statute which does not differentiate between the sophisticated and the unsophisticated seller.

In this diversity action we are bound by the Georgia Supreme Court's interpretation of this statute:

> We therefore construe Code Ann. Sec. 109A–2–615 to mean that in order for there to be an exception to and an exemption from the rule of allocation applicable to a contract of sale, such a contract must contain an affirmation provision that the seller will perform the contract even though the contingencies which permit allocation might occur.

*Mansfield Propane Gas Company, Inc. v. Folger Gas Company,* 231 Ga. 868, 870, 204 S.E.2d 625, 628 (1974). *See also Gold Kist v. J.W. Stokes,* 138 Ga.App. 482, 226 S.E.2d 268 (1976), and *Swift Textiles, Inc. v. W.C. Lawson,* 135 Ga.App. 799, 219 S.E.2d 167 (1975).

shipment, and the quantities never delivered, expressed in metric tons:

| Date Contract Made | Quantity Due Under Contract | Quantity Settled Or Delivered | Date of Settlement Or Shipment | Quantity Never Delivered |
|---|---|---|---|---|
| July 2, 1980 | 320 | [120] | [Sept. 4, 1980] | |
| | | 119.9 | April 29, 1981 | |
| | | 52.6 | May 29, 1981 | |
| | 320 | 292.5 | | 27.5 |
| July 3, 1980 | 1200 | [600] | [Oct., 1980] | |
| | | 193.5 | March 4, 1981 | |
| | | 184 | March 4, 1981 | |
| | | 74.9 | May 29, 1981 | |
| | 1200 | 1052.4 | | 147.6 |
| July 9, 1980 | 150 | 74.4 | April 29, 1981 | |
| | | 54.8 | May 29, 1981 | |
| | 150 | 129.2 | | 20.8 |
| | | | | 195.9 |

2. Except so far as a seller may have assumed a greater obligation and subject to Code Section 11–2–614 on substituted performance:
   (a) Delay in delivery or nondelivery in whole or in part by a seller who complies with paragraphs (b) and (c) of this Code section is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable by the occurrence of a contingency the nonoccurrence of which was a basic assumption on which the contract was made or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.
   (b) Where the clauses mentioned in paragraph (a) of this Code section affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. He may so allocate in any manner which is fair and reasonable.
   (c) The seller must notify the buyer seasonably that there will be delay or nondelivery and, when allocation is required under paragraph (b) of this Code section, of the estimated quota thus made available for the buyer. (Code 1933, § 109A–2–615, enacted by Ga.L. 1962, p. 156, § 1.)

3. Gibbs also asserted that the contracts were mutually modified to accord it the right to allocate. In view of the jury's answer to Interrogatory 4, note 5, *infra,* we pretermit discussion of the evidence upon which it relied.

Since neither of the contracts contained such an affirmative provision, Gibbs was entitled to allocate if it could satisfy the jury [4] by a preponderance of the evidence that the occurrence of the contingency (drought) was not reasonably foreseeable when the contracts were entered into and that performance as agreed was made impracticable thereby. Obviously, its burden entailed the production of persuasive factual evidence.

B. The twelve day trial of this case produced a seventeen volume record, which we have carefully reviewed. The issue of liability was submitted to the jury by seven interrogatories which, together with jury's answers thereto, are set out in the margin.[5] The court's charge to the jury, into which counsel had commendable input, clearly identified the issues and applicable principles of law. The record reveals that the evidence was forcibly argued by skilled attorneys.

At the close of the evidence, Alimenta moved for a directed verdict, which was denied by the court. After the entry of final judgment, Alimenta filed a motion in the alternative for judgment NOV or for a new trial, which the court overruled. Thus, we are called upon to search the record to determine whether it contains sufficient material evidence to support the jury's answers to the special interrogatories. We are acutely aware that the factual issues were vigorously contested by both parties. Our focus upon the record evidence which tends to lend support to the jury's answers is not intended to denigrate the body of evidence adduced in opposition thereto.

Relevant to the issue of foreseeability of the contingency of a drastically reduced production of edible peanuts are the facts surrounding and antecedent to the execution of the three contracts involved. The crop was planted in April and May. Rainfall was adequate in April, May and June, and the crop came up in good condition. The price was stable; everything was normal. In the twenty-five years preceding 1980, the nation's peanut industry experienced steady growth in total production with yield per acre increasing 250% over that period as the result of increased irrigation, better herbicides, and the development of the "flo-runner" variety. In addition to Alimenta, Gibbs sold 1980 crop peanuts to seventy-five other customers and had contracted to purchase peanuts from fifteen

4. In this bifurcated trial, it was agreed by counsel that the issue of liability was to be submitted to a jury and the issue of damages was reserved to the Court.

5.
1.
Do you find that Gibbs was justified in allocating?
Answer: Yes.
2.
Do you find that Gibbs' notice to Alimenta was within a reasonable time?
Answer: Yes.
3.
Do you find that Gibbs' allocation was fair and reasonable?
Answer: Yes.
4.
Do you find that in exchange for early delivery of Stevens' peanuts, Alimenta agreed to accept allocation and reserve only the right to contest the fairness and reasonableness of the allocation while agreeing to give up the right to contest whether the allocation was justified?

Answer: No.
5.
Do you find that the delay in delivery of peanuts ultimately delivered by Gibbs to Alimenta was caused by Alimenta or by Gibbs?
Answer: Alimenta.
6.
Indicate the date up to which you find either party was responsible for such delay in delivery.
Answer: January 15th.
7.
Further responding to Interrogatory No. 6, please indicate which of the parties you find was responsible for the delay from January 15 to February 12, 1981.
Answer: Alimenta.
And which of the parties you find was responsible for the delay between March 18 and May 29, 1981.
Answer: Gibbs.
[As will appear from the discussion of Gibbs' cross-appeal, Interrogatory 7 was submitted to the jury, after it had returned its answers to Interrogatories 1–6, to resolve a patent ambiguity in its answer to Interrogatory 6].

shellers in quantities 7% in excess of its sales.

In early July a hot and dry spell developed and became a "full fledged drought" which did not break until late September. A climatology expert testified that July, 1980, was the driest and third hottest July in 91 years of recorded data and that August, 1980 was the third driest and fifth hottest August. He further testified that the onset and duration of this drought in the southeast and southwest was unprecedented and that he would have viewed its probability before 1980 as "very low, near zero". These severe weather conditions throughout the harvesting season had a severe impact on the peanut crop, reducing production to 48% of the amount produced the previous year.

In early October, Gibbs received notices from thirteen of the fifteen shellers from which it had contracted to buy peanuts, each stating that because of the crop shortage it was invoking U.C.C. Sec. 2–615 and containing estimates of the quantities Gibbs could expect to receive. Bearing on the issue of commercial impracticability of performance, on October 17 Gibbs calculated that, on the basis of such estimates, it would receive only 52% of the peanuts it had contracted to purchase and that fully to perform all of its sales obligations, it would be required to purchase an additional 5,700 tons at a cost of $9,200,000.00. It thereupon proceeded to notify all of its customers that it was invoking the provisions of Sec. 2–615, advising each of the expected percentages, Alimenta was so notified on October 21 and told to expect between 80% and 90% of the contract quantity. The undisputed evidence is that it ultimately received 87%.[6]

It is uncontroverted that there were delays in shipments due under the contracts and the jury was required to fix the responsibility therefor by Interrogatory 7.[7] Within the time frame of the peanut contracts, the parties had entered into a separate transaction. Gibbs sold Alimenta approximately 900,000 pounds of cottonseed oil for the amount of $276,000.00 under a contract which required a payment contemporaneously with transfer of a negotiable bill of lading. Fortuitously, Alimenta obtained possession of the oil without paying Gibbs. After Gibbs gave notice of allocation and beginning in early December, Gibbs made several demands for payment therefor and continued such demands through January and into March, 1981. Alimenta decided to withhold payment until the peanut allocation problem was worked out.

In early January, 1981, Gibbs tendered the balance of the Stevens Pack Peanuts[8] with a written demand that payment and delivery be accomplished concurrently through presentation of documents to a bank, including a sight draft, invoice, inspection certificates, and a delivery order. Alimenta declined to make payment in that fashion.[9] There ensued a series of negotiations which culminated in a proposal by Gibbs on January 16, 1981, that it ship the peanuts to cold storage, the warehouse receipt to be made out to Gibbs. Gibbs would thereupon give written authority to a broker to endorse the receipt to Alimenta upon payment.

Alimenta neither responded to this proposal nor the request for payment of the cottonseed oil. Further negotiations were unproductive and on February 12, 1981, Gibbs' attorney sent a letter to Alimenta's

---

6. Based on Gibbs' actual shortage of peanuts from all the shellers and the market prices for October, November and December, it would have cost Gibbs $3,800,000 to purchase peanuts to fulfill its contractual obligations to all its customers. Its anticipated profit from its Alimenta contracts was $18,000.00. As of December 31, 1980, its net worth was approximately $2,400,000.00.

7. Note 5, *supra.*

8. At the time the contracts were negotiated, it was understood that the first three deliveries, consisting of 900 tons, would come from Stevens Industries (the Stevens Pack Peanuts).

9. Although the contracts contemplated that payments were due after deliveries, Gibbs, reacting to the insecurity of the payment due for the cottonseed oil, insisted upon simultaneous delivery and payment.

attorney demanding assurance of due performance of the peanut contracts and payment for the cottonseed oil, pursuant to U.C.C. Sec. 11–2–609.[10] Finally, on March 18, 1981, Alimenta paid for and simultaneously received title to the Stevens Pack Peanuts and an additional 405,000 pounds of peanuts and paid for the cottonseed oil. Thereafter, Gibbs made deliveries on April 29 and May 29, 1981, thus completing 87% of its contractual obligation.

The answer of the jury to Interrogatory 1, in obedience to the instruction of the court with respect to proof required to sustain a Section 2–615 defense, subsumes its findings that the occurrence of the 1980 drought and its effect on the peanut crop were not reasonably foreseeable when the contracts were entered into and that, measured objectively, performance was made commercially impracticable thereby. Concluding that the answers of the jury to the special interrogatories were supported by substantial evidence, we affirm on the direct appeal.[11]

## II. *The Cross-appeal*

The cross-appeal borders on the frivolous. It is centered upon an isolated sentence in the court's charge, viz, "After Gibbs got an adequate assurance from Alimenta that Alimenta would perform, and in any event by no later than March 18, 1981, Gibbs would not be excused from making deliveries." (R. 15–101). Gibbs objected on the ground that it was tantamount to a directed verdict that it was responsible for all delays from March 18 to May 29, 1981.

Conceding that it could not rely upon Sec. 2–609 to excuse timely deliveries after March 18, it contended that there was evidence from which the jury could infer that the occurrence of logistical problems after that date, for which it was not responsible, afforded adequate excuses.

Assuming, arguendo, that this was error, subsequent events convince us that it avails Gibbs nothing. When the jury returned its enigmatic answer "January 15th" to Interrogatory 6, the date of March 18 was conspicuous by its absence. The ambiguity inherent in the answers to Interrogatories 5 and 6 was instantly recognized. Following an extended colloquy between court and counsel (R. 16, 21–28), it was agreed that the jury should be instructed to answer the jointly composed supplementary Interrogatory 7. In submitting this interrogatory to the jury, the court stated: "They [counsel] are going to try to explain it to you. They can do a better job than I can." (R. 16–43). Counsel were then permitted to reargue the evidence as it related to the three specified periods of delay. Error, if any, was either harmless or cured. Accordingly, we affirm on the cross-appeal.

AFFIRMED.

---

**10.** 11–2–609. Right to adequate assurance of performance.

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract. (Code 1933, § 109A–2–609, enacted by Ga.L. 1962, p. 156, § 1.)

**11.** That is not to say that there is not substantial evidence in the record which would have supported contrary answers. It is to say, however, that it is not our function to retry the facts.